**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:_____

Filing Date:   June 25, 2015

NO. 34,013

STATE OF NEW MEXICO, Plaintiff,
ex rel., FRANK C. FOY and SUZANNE B. FOY, *qui tam* Plaintiffs,

Plaintiffs-Petitioners and
Cross-Respondents,

v.

AUSTIN CAPITAL MANAGEMENT, LTD,
AUSTIN CAPITAL MANAGEMENT GP CORPORATION,
CHARLES W. RILEY, BRENT A. MARTIN, DAVID E.
FRIEDMAN, WILL JASON ROTTINGER, VICTORY
CAPITAL MANAGEMENT, INC., KEYCORP, BEREAN
CAPITAL, DUDLEY BROWN, TREMONT PARTNERS, INC.,
TREMONT CAPITAL MANAGEMENT, INC., TREMONT GROUP
HOLDINGS, INC., OPPENHEIMER FUNDS, INC., GARY BLAND,
DAVID CONTARINO, BRUCE MALOTT, MEYNERS + COMPANY,
MARC CORRERA, ANTHONY CORRERA, SANDIA ASSET
MANAGEMENT, ALFRED JACKSON, DAVIS HAMILTON AND
JACKSON, GUY RIORDAN, JUNIPER CAPITAL, EILEEN KOTECKI,
DAN HEVESI, HENRY "HANK" MORRIS, JULIO RAMIREZ, PAUL
CROSS, CROSSCORE MANAGEMENT, SDN INVESTORS, PSILOS
GROUP, ALBERT WAXMAN, JEFFREY KRAUSS, STEPHEN KRUPA,
DAVID EICHLER, DARLENE COLLINS, WETHERLY CAPITAL
GROUP, DAN WEINSTEIN, VICKY SCHIFF, QUADRANGLE GROUP,
ALDUS EQUITY, SAUL MEYER, MARCELLUS TAYLOR, MATTHEW
O'REILLY, RICHARD ELLMAN, DEUTSCHE BANK, DIAMOND EDGE

CAPITAL, MARVIN ROSEN, CARLYLE MEZZANINE PARTNERS, CARLYLE GROUP, DB INVESTMENT MANAGERS, TOPIARY TRUST, PARK HILL GROUP, DAN PRENDERGAST, CATTERTON PARTNERS, BLACKSTONE GROUP, GOLD BRIDGE CAPITAL, DARIUS ANDERSON, KIRK ANDERSON, ARES MANAGEMENT, INROADS GROUP, CAMDEN PARTNERS, HFV, BARRETT WISSMAN, TAG, AJAX INVESTMENTS, CLAYTON DUBILIER AND RICE, INTERMEDIA, LEO HINDERY, WILLIAM R. HOWELL, CABRERA CAPITAL, MARTIN CABRERA, CRESTLINE INVESTORS, JOHN DOE #1 and JOHN DOE #3 THROUGH #50,

Defendants-Respondents and
Cross-Petitioners.


**ORIGINAL PROCEEDINGS ON CERTIORARI**
**John William Pope, District Judge**

Victor R. Marshall & Associates, P.C.
Victor R. Marshall
Albuquerque, NM

for Petitioners and Cross-Respondents

FallickLaw, Ltd.
Gregg Vance Fallick
Albuquerque, NM

Esquivel Law Firm, LLC
Martin R. Esquivel
Albuquerque, NM

Basham & Basham, P.C.
Katherine Ann Basham
Santa Fe, NM

for Respondent and Cross-Petitioner Bruce Malott

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Andrew G. Shultz
Albuquerque, NM

Fried, Frank, Harris, Shriver & Jacobson, LLP
Peter L. Simmons
New York, NY

for Respondents and Cross-Petitioners Topiary Trust and DB Investment Managers, Inc.

Simone, Roberts & Weiss, P.A.
Norman F. Weiss
Albuquerque, NM

for Respondent and Cross-Petitioner David Contarino

Montgomery & Andrews, P.A.
Stephen S. Hamilton
Santa Fe, NM

for Respondent and Cross-Petitioner Gary Bland

French & Associates, P.C.
Erica Anderson
Stephen French
Albuquerque, NM

for Respondent and Cross-Petitioner Guy Riordan

**OPINION**

**MAES, Justice**.

{1}    In this case, we address whether the retroactive application of the Fraud Against Taxpayers Act, NMSA 1978, Sections 44-9-1 to -14 (2007) ("FATA" or "the Act") violates the Ex Post Facto Clauses of the United States and New Mexico Constitutions. *See* U.S. Const. art 1, § 10, cl. 1; N.M. Const. art. 2, § 19. We hold that FATA is constitutional. The treble damages under FATA are predominantly compensatory and may be applied retroactively to conduct that occurred prior to its effective date. We decline to resolve the issue of whether the civil penalties awarded under FATA are punitive and violate ex post facto principles until there is a definitive amount awarded.

**BACKGROUND**

{2}    This appeal concerns the second of two qui tam actions filed by former New Mexico Education Retirement Board ("ERB") Chief Investment Officer Frank Foy and his wife Suzanne Foy ("Foys"), attacking the management of the investment portfolios of the ERB and of the New Mexico State Investment Council ("SIC"). The Foys "allege that Defendants—who include Wall Street firms and investment advisors, as well as high-ranking state officials—executed fraudulent schemes that

led to the loss of hundreds of millions of dollars at the expense of the [SIC] and the [ERB]. " *State ex rel. Foy v. Austin Capital Mgmt., Ltd.*, 2013-NMCA-043, ¶ 2, 297 P.3d 357.

{3}    A qui tam action is "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government . . . will receive." *Black's Law Dictionary* 1262 (7th ed. 1999).  The Foys filed their first qui tam action, *State ex rel. Foy v. Vanderbilt Capital Advisors, LLC*, D-101-CV-2008-1895 ("*Vanderbilt*"), pursuant to FATA in the First Judicial District Court on July 14, 2008.  That complaint included allegations of misconduct dating back to 2003, predating the enactment of FATA in 2007.  Section 44-9-12(A) of FATA allows a qui tam plaintiff to bring a civil action for conduct that occurred prior to the effective date of that Act. District Judge Stephen Pfeffer issued a sua sponte order expressing concern "that there may be *ex post facto* implications arising from the retroactive application of the Act[.]"  Following briefing, the district court issued an order dismissing the Foys' claims, finding that the retroactive application of FATA, as authorized by Section 44-9-12(A), was unconstitutional.   The district court specifically pointed to the award of treble damages and concluded that the Act "is punitive in purpose or effect."  In order to save the statute, the district court severed

2

the retroactive application language from Section 44-9-12(A), leaving the rest of the statute intact, including treble damages, but inapplicable to anything that occurred prior to 2007, which would exclude from this lawsuit most, if not all, of what allegedly occurred.

{4}     Three months after the complaint in *Vanderbilt* was unsealed, the Foys filed a complaint under FATA against Austin Capital Management and several other defendants also in the First Judicial District Court. After a series of recusals, excusals, and administrative assignments, all of the judges of the First Judicial District were excused. This Court appointed Judge John Pope to preside over the case.

{5}     The Foys raised the retroactivity issue with Judge Pope, seeking a ruling that FATA is constitutional. In response, Defendants Park Hill Group, Blackstone Group, and Prendergast provided Judge Pope with a copy of Judge Pfeffer's previous ruling that the retroactive application of FATA is unconstitutional and asked for a similar ruling. On July 8, 2011, Judge Pope ruled that the retroactive application of FATA is unconstitutional and explicitly "adopt[ed] and incorporate[d] the reasoning and analysis" contained in Judge Pfeffer's earlier decision. The Court of Appeals granted leave for the Foys to file an interlocutory appeal. The Court of Appeals affirmed "the

3

district court's legal conclusion that retroactive application of FATA is unconstitutional and the court's decision to sever the retroactive aspects from the statute." *See Foy*, 2013-NMCA-043, ¶ 52. This appeal and cross-appeal follow.

**DISCUSSION**

**I.    The Attorney General's Prior Knowledge of Incriminating Information Does Not Bar the District Court From Proceeding in *Austin Capital***

{6}    Before addressing the issue of the retroactivity of FATA, we first address the issue of subject matter jurisdiction raised by Cross-petitioner Bruce Malott. *See Wilson v. Denver*, 1998-NMSC-016, ¶ 8, 125 N.M. 308, 961 P.2d 153 ("Prior to addressing the substantive issue certified for interlocutory appeal, we raise, sua sponte, the question whether the district court had subject matter jurisdiction over these election contests."). Malott argues that the district court lacked subject matter jurisdiction over the Foys' second-filed FATA action, *Austin Capital*. Malott's most salient argument is that the district court was barred under FATA from hearing *Austin Capital*. *See* § 44-9-9(B) ("No court shall have jurisdiction over an action . . . against an elected or appointed state official . . . if the action is based on evidence or information known to . . . the attorney general when the action was filed.") The district court tentatively rejected this argument. *See Foy*, 2013-NMCA-043, ¶ 4. The

4

Court of Appeals declined to address the issue of subject matter jurisdiction, holding that "both arguments would benefit from factual developments and legal arguments to the court below." *Id.* ¶ 5.

{7}     In determining whether a court has subject matter jurisdiction, we "ask whether [the matter before the court] falls within the general scope of authority conferred upon such court by the constitution or statute." *State v. Chavarria*, 2009-NMSC-020, ¶ 11, 146 N.M. 251, 208 P.3d 896 (alteration in original, internal quotation marks and citation omitted). "The source of a district court's subject matter jurisdiction derives from the New Mexico Constitution." *Lu v. Educ. Trust Bd. of N.M.*, 2013-NMCA-010, ¶ 9, 293 P.3d 186. Under Article VI, Section 13 of the New Mexico Constitution, "[t]he district court shall have original jurisdiction in all matters and causes *not excepted in this constitution*, and such jurisdiction of special cases and proceedings as may be conferred by law . . . ." *Id.* (emphasis added). In other words, "New Mexico district courts are courts of general jurisdiction having the power to hear all matters not excepted by the constitution and those matters conferred by law." *Lyndoe v. D.R. Horton, Inc.*, 2012-NMCA-103, ¶ 12, 287 P.3d 357; *see also Daniels Ins. Agency, Inc. v. Jordan*, 1982-NMSC-148, ¶ 8, 99 N.M. 297, 657 P.2d 624 ("[T]he district courts have original jurisdiction over all cases other than those specifically

5

excepted by the New Mexico Constitution and such jurisdiction of special cases and proceedings as may be conferred by law . . . ." (internal quotation marks and citation omitted)).

{8} *Austin Capital* falls within the general scope of authority conferred upon the district court by Article VI, Section 13 of the New Mexico Constitution because no provision in the New Mexico Constitution specifically excepts it. The district court had subject matter jurisdiction over this action. The proviso in FATA that an action may not proceed against a State official "if the action is based on evidence or information known to . . . the attorney general when the action was filed," § 44-9-9(B), is more in the nature of a mandatory precondition that the plaintiff must satisfy to proceed with a qui tam action. Therefore, the question before the Court is not really one of jurisdiction, but rather whether the Foys' pending qui tam action in *Vanderbilt* bars litigation in the second-filed qui tam action, *Austin Capital*, under FATA—based on prior knowledge of the Attorney General. We proceed to that issue.

{9} Under FATA, a qui tam plaintiff is required to disclose to the Attorney General "substantially all material evidence and information the qui tam plaintiff possesses" at the time the complaint is filed. *See* § 44-9-5(C). The purpose of this requirement is to give the Attorney General a chance to intervene in the action. *See* § 44-9-5(D)

6

(giving the Attorney General 60 days to notify the court if it intends to intervene). This disclosure requirement also serves as a basis for the statutory bar found in Section 44-9-9(B) that prevents suit under FATA against an elected or appointed state official "if the action is based on evidence or information known to . . . the attorney general when the action was filed." *Id.*

{10} Section 44-9-9(B) places a limitation on the district court's ability to entertain FATA actions against state officials. For an action to be barred under Section 44-9-9(B), the action must (1) be against a state official *and* (2) be "based on evidence or information known to . . . the attorney general when the action was filed." *See id.* As we will explain below, the Foys' action in *Austin Capital* meets the first requirement of the statutory bar, but fails to satisfy the second.

{11} As a preliminary matter, it is important to note that Section 44-9-9(B) does not affect the Foys' first filed qui tam action, *Vanderbilt*, a conclusion conceded by Malott. Second, Section 44-9-9(B) does not apply to any of the private party defendants in *Austin Capital*. Section 44-9-9(B) only bars actions against public officials such as "an elected or appointed state official, a member of the state legislature or a member of the judiciary." *See id.* Therefore, Section 44-9-9(B) can only bar suit against the State official defendants in *Austin Capital*. The complaints

7

in *Vanderbilt* and *Austin Capital* name the same state official defendants, including Malott. To determine whether these State official defendants are barred from suit in *Austin Capital*, we must decide whether *Austin Capital* is "based on evidence or information known to . . . the attorney general when the action was filed." *See* § 44-9-9(B). In making such a determination it is helpful to examine the statute's historical underpinnings.

{12} Section 44-9-9(B) is patterned after an analogous section of the federal False Claims Act which similarly bars certain types of defendants and certain types of claims. *See* 31 U.S.C. § 3730(e)(2)(A) (2014) ("No court shall have jurisdiction over an action brought . . . against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought."). Section 3730(e)(2)(A) "[does] not present an absolute bar to *qui tam* suits; it simply retained the pre-1986 'government knowledge' exception with slightly different language." *See* 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.03(A), at 4-171 (4th ed. 2011). "It was recommended by the [U.S.] Justice Department as an exception for those suits which might be politically motivated." *Id.* at 4-172 (internal quotation marks omitted).

{13} The "government knowledge bar" was enacted in response to the U.S. Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010) ("This amendment erected what came to be known as a Government knowledge bar."); *see also* 1 Boese, *supra*, § 1.02, at 1-15. In *Hess*, qui tam plaintiff Marcus alleged a collusive bidding scheme by electrical contractors working on Public Works Administration projects in Pennsylvania. *See Hess*, 317 U.S. at 539. Marcus purportedly discovered the alleged fraud by reading a criminal indictment previously filed against the defendants. *See id.* at 545. The Justice Department argued that Marcus had not brought any new information to the government's attention. *See id.* The U.S. Supreme Court upheld Marcus's award, pointing out that the statute allowed suit to be brought "by any person" without "exception or qualification." *See id.* at 546. The U.S. Supreme Court has since referred to the qui tam action in *Hess* as a "quintessential parasitic suit." *See Graham Cnty.*, 559 U.S. at 294 (internal quotation marks and citation omitted).

{14} Following *Hess*, Congress amended the False Claims Act in 1943 to preclude qui tam actions "based upon evidence or information [already] in the possession of the United States, or any agency, officer or employee thereof, at the time such suit

9

was brought." *See Graham Cnty.*, 559 U.S. at 294 (internal quotation marks and citation omitted). Therefore, "[once] the United States learned of a false claim, only the Government could assert its rights under the [False Claims Act] against the false claimant." *See id.* (internal quotation marks and citation omitted). This amendment was designed to avoid more "parasitic" suits like *Hess*. *See* 1 Boese, *supra*, § 4.02(A), at 4-50. "The barriers set up in the 1943 Amendments led to decreased use of the *qui tam* provisions." *Id.* § 1.02, at 1-15; *see also Graham Cnty.*, 559 U.S. at 294 ("In the years that followed the 1943 amendment, the volume and efficacy of *qui tam* litigation dwindled.").

{15}     In 1986, Congress replaced the government knowledge bar with the "public disclosure bar." *See id.* at 294-95. Under the public disclosure bar, "[t]he court shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." *See* 31 U.S.C. § 3730(e)(4)(A). The purpose of the public disclosure bar is "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty.*, 559 U.S. at 295. In other words, "[t]he public disclosure bar is . . . chiefly designed to separate the opportunistic relator [qui tam plaintiff] from the relator [qui tam plaintiff] who has genuine, useful information that the

10

government lacks." *Grynberg ex rel. United States v. Exxon*, 566 F.3d 956, 961 (10th Cir. 2009). "[T]he point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one." *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1049 (10th Cir. 2004) (alteration in original, internal quotation marks and citation omitted). We determine that this overarching concern should guide our determination regarding whether *Austin Capital* is based upon information known to the Attorney General.

{16} We find the cases construing FATA's federal analogue, the False Claims Act, helpful in understanding the context and purpose of FATA. *See Akins v. United Steel Workers of Am.*, 2010-NMSC-031, ¶ 15, 148 N.M. 442, 237 P.3d 744 ("In developing a body of state common law, we may look to federal law for guidance where it is persuasive and consistent with our state laws and policies."). Although cases like *Graham County*, *Exxon*, and *Praxair* do not interpret the federal counterpart to Section 44-9-9(B), they interpret the complementary public disclosure bar, which aides in understanding the purpose and context of FATA.

{17} These cases indicate a legislative intent to prohibit "parasitic" qui tam plaintiffs while also providing an incentive for meritorious qui tam plaintiffs to pursue their claims. This conclusion is especially true in light of the so-called "first to file" bar.

11

*See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."); *see also* § 44-9-5(E) ("When a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene or bring a related action based on the facts underlying the pending action.").  This bar "functions both to eliminate parasitic plaintiffs who piggyback off the claims of a prior relator, and to encourage legitimate relators to file quickly by protecting the spoils of the first to bring a claim." *See Exxon*, 566 F.3d at 961.

{18}     Applying these principles, we hold that the district court is not barred from hearing the case under FATA.  The Foys' second FATA action, *Austin Capital*, is not barred under Section 44-9-9(B) because *Austin Capital* is not a "parasitic" suit like the one in *Hess* in which the "opportunistic" qui tam plaintiff simply repeated allegations made by someone else in a federal indictment.  First, as alleged in the complaint, Mr. Foy as former Chief Investment Officer of the ERB may have "genuine, useful information that the government lacks." *See Exxon*, 566 F.3d at 961.  He is not simply repeating someone else's allegations.

{19}     Second, the statutory bar was designed to prohibit qui tam plaintiffs from

12

piggybacking off the claims of a prior relator in an effort to unfairly recover a portion of the prior relator's damage award. Here, the Foys are the plaintiffs in both cases. It would be an absurd construction of FATA to hold that the Foys are piggybacking off their own prior claims in an effort to unfairly recover a portion of their potential damage award in *Vanderbilt*. Furthermore, barring *Austin Capital* might discourage future qui tam plaintiffs from turning up wrongdoing discovered after their case was filed. Finally, the record reflects that the Attorney General did not raise an objection to the filing of *Austin Capital* and authorized the Foys to proceed, stating that "the best interests of the State of New Mexico are served by uncovering, as soon as possible, all of the facts relating to the matters stated in the complaint." Therefore, we disagree with Malott and hold that *Austin Capital* is not barred by being "based on evidence or information known to . . . the attorney general when the action was filed." *See* § 44-9-9(B).

## II.     The Case is Not Barred by Claim Splitting

{20}     Malott argues that in filing *Austin Capital*, the Foys are engaging in claim splitting. "It is axiomatic that piecemeal litigation is not favored by the courts." *Callaway v. Ryan*, 1960-NMSC-088, ¶ 21, 67 N.M. 283, 354 P.2d 999. The rule against claim splitting "is grounded upon public policy designed to avoid a

multiplicity of suits." *United Nuclear Corp. v. Fort*, 1985-NMCA-049, ¶ 22, 102 N.M. 756, 700 P.2d 1005. "The rule against splitting a cause of action is an equitable one whose application is left to judicial discretion based on the factual circumstances of individual cases." 1A C.J.S. *Actions* § 225 (2015).

{21} In arguing against claim splitting, Malott cites primarily to New Mexico cases pertaining to res judicata, or claim preclusion. However, "[t]he rules of res judicata are applicable only when a final judgment is rendered." *See* Restatement (Second) of Judgments § 13 (1982). Because a final judgment on the merits has not been rendered in *Vanderbilt*, res judicata does not apply to *Austin Capital*. We therefore decline to dismiss *Austin Capital* on the basis of claim splitting.

{22} Nevertheless, Malott has identified a genuine concern regarding the burden on defendants in multiple suits and the additional burden placed on the judicial system by these multiple suits. *See Concerned Residents of Santa Fe North, Inc. v. Santa Fe Estates, Inc.*, 2008-NMCA-042, ¶ 17, 143 N.M. 811, 182 P.3d 794 ("The res judicata doctrine is invoked to protect litigants from the burden of multiple litigation and to promote both judicial economy and the policy favoring reliance on final judgments by minimizing the possibility of inconsistent decisions."). We recognize that in allowing *Austin Capital* to proceed, the Foys will have two FATA actions pending

at the same time in the same judicial district.

{23} To promote judicial economy and minimize the possibility of inconsistent decisions, we hold that the Foys' FATA complaints should be consolidated and heard in a single action. Therefore, pursuant to our power of superintending control, *see* N.M. Const. art. VI, § 3, we consolidate *Austin Capital* and *Vanderbilt* and will appoint a pro-tem judge to oversee the consolidated action. *See Maestas v. Hall*, 2012-NMSC-006, ¶ 9, 274 P.3d 66 (consolidating several redistricting cases and appointing a pro-tem judge to preside over the litigation). Although the Foys have identified additional cases that may be consolidated, we leave that determination to the discretion of the district court. *See* Rule 1-042(A) NMRA ("When actions involving a common question of law or fact are pending within a judicial district, the court may . . . order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.").

**III. The Retroactive Application of FATA is Constitutional**

{24} The central question before this Court is whether the retroactive application of FATA is unconstitutional.

**A. FATA**

{25} FATA prohibits knowingly presenting false or fraudulent claims for payment

15

from the State and conspiring to defraud the State. *See* § 44-9-3(A). FATA was enacted in 2007, but includes a provision that explicitly authorizes retroactive claims. Section 44-9-12(A) states:

> A civil action pursuant to the Fraud Against Taxpayers Act may be brought for conduct that occurred prior to the effective date of that act, but not for conduct that occurred prior to July 1, 1987.

The statutory penalties for violating FATA include:

> (1) three times the amount of damages sustained by the state because of the violation;
> (2) a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation;
> (3) the costs of a civil action brought to recover damages or penalties; and
> (4) reasonable attorney fees, including the fees of the attorney general or state agency counsel.

*See* § 44-9-3(C). FATA closely tracks the longstanding federal False Claims Act. *Compare* § 44-9-3, *with* 31 U.S.C. § 3729 (2014). Like the federal Act, FATA allows the Attorney General or a qui tam plaintiff, on behalf of the State, to bring a civil action for violation of the Act. *See* §§ 44-9-4(A), 44-9-5. FATA authorizes a qui tam plaintiff to recover up to thirty percent of the damage award as well as reasonable expenses incurred in the action and reasonable attorneys' fees. *See* § 44-9-7. This award serves as an incentive to private individuals to act on behalf of the public good

16

by bringing the suit. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769-70 (2000). The State is entitled to the remainder of the damage award (all proceeds not awarded to the qui tam plaintiff) to fully reimburse the State for the false claim paid. *See* § 44-9-7(E).

**B.      Retroactive Laws and the Ex Post Facto Clause**

{26}      The United States and New Mexico Constitutions prohibit the Legislature from enacting ex post facto laws. *See* U.S. Const. art. 1, § 10, cl. 1; N.M. Const. art. 2, § 19. "'The Ex Post Facto Clause flatly prohibits retroactive application of penal legislation.'" *State v. Ordunez*, 2012-NMSC-024, ¶ 14, 283 P.3d 282 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)). "The prohibition does not apply to penalties that are considered remedial in nature." *Foy*, 2013-NMCA-043, ¶ 11. Defendants bear the burden of proving that FATA is unconstitutional beyond all reasonable doubt. *See State v. Druktenis*, 2004-NMCA-032, ¶ 15, 135 N.M. 223, 86 P.3d 1050. ("In regard to Ex Post Facto Clause . . . constitutional attacks, there exists a presumption of constitutionality, and the party attacking the constitutionality of the statute has the burden of proving the statute is unconstitutional beyond all reasonable doubt.").

{27}      In this case, Defendants argue that the sanctions (money damages) authorized

17

under FATA are penal in nature. And, therefore, imposing these sanctions for conduct that occurred prior to the effective date of FATA would be retroactive application of penal legislation, a direct violation of the Ex Post Facto Clauses.

**C.     The Legislature Intended FATA to Apply Retroactively**

{28}     To determine whether a sanction is punitive and thus violative of the Ex Post Facto Clause, we first look to the "government's purpose in enacting the legislation." *City of Albuquerque ex rel. Albuquerque Police Dep't v. One (1) 1984 White Chevy Ut.*, 2002-NMSC-014, ¶ 11, 132 N.M. 187, 46 P.3d 94 (internal quotation marks and citation omitted). "In assessing Legislative intent, the reviewing court looks first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Zhao v. Montoya*, 2014-NMSC-025, ¶ 18, 329 P.3d 676 (internal quotation marks and citation omitted). However, "we look not only to the language used in the statute, but also to the object sought to be accomplished and the wrong to be remedied." *Starko v. Presbyterian Health Plan, Inc.*, 2012-NMCA-053, ¶ 20, 276 P.3d 252 (internal quotation marks and citation omitted), *rev'd on other grounds by Starko v. N.M. Human Servs. Dep't*, 2014-NMSC-033, ¶¶ 2, 42, 333 P.3d 947.

{29}     The specific legislative designation of FATA proceedings and penalties as

"civil" indicates that the Legislature intended to craft a civil statute. FATA consistently uses the term "civil action" when referring to the proceedings brought under the statute. *See* § 44-9-4(A) (allowing the Attorney General to "bring a civil action . . . pursuant to the Fraud Against Taxpayers Act"); § 44-9-4(B) (allowing the Attorney General to "delegate the authority to . . . bring a civil action to the state agency to which a false claim was made"); § 44-9-5(A) (allowing a qui tam plaintiff to "bring a civil action for a violation of Section 3 of the Fraud Against Taxpayers Act on behalf of the person and the state" (internal citation omitted)); § 44-9-12(A) ("A civil action pursuant to the Fraud Against Taxpayers Act may be brought at any time." (internal citation omitted)). Furthermore, FATA is placed within the section of the New Mexico Statutes Annotated entitled "Miscellaneous Civil Law Matters." *See* §§ 44-9-1 to -14; *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) ("Kansas' objective to create a civil proceeding is evidenced by its placement of the Act within the Kansas probate code, instead of the criminal code."). In addition, not a single section of FATA specifies or punishes criminal conduct. *See State v. Kirby*, 2003-NMCA-074, ¶ 25, 133 N.M. 782, 70 P.3d 772 (finding that the Securities Act has a remedial purpose in part because "only one section specifies criminal conduct"). Finally, the penalties imposed under FATA are designated as "civil." *See* §

19

44-9-3(C)(2).

{30} We recognize that "in New Mexico, the fact that the Legislature . . . chose[] to label a proceeding 'civil' or 'criminal' is not dispositive of the true nature of that proceeding," *see State v. Nuñez*, 2000-NMSC-013, ¶ 46, 129 N.M. 63, 2 P.3d 264, and cannot "be utilized to defeat the applicable protections of constitutional law." *See N.M. Taxation & Revenue Dep't v. Whitener*, 1993-NMCA-161, ¶ 12, 117 N.M. 130, 869 P.2d 829 (discussing with approval the holding of *United States v. Halper*, 490 U.S. 435, 447-48 (1989), *abrogated by Hudson v. United States*, 522 U.S. 93, 95, 100–03 (1997)).

{31} Looking beyond the "civil" label to the overall purpose of the statute, we determine that the Legislature intended FATA to be remedial in nature. Consistent with other remedial statutes, FATA compensates the State for losses incurred as a result of fraud and encourages qui tam plaintiffs to bring civil actions to root out fraud. *See* § 44-9-7(B) (entitling qui tam plaintiff to up to thirty percent of the proceeds of the action or settlement), (E) ("The state is entitled to all proceeds collected in an action or settlement not awarded to a qui tam plaintiff."); *see also Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 147 N.M. 583, 227 P.3d 73 (stating that the Unfair Practices Act which allows treble damages for persons

20

damaged by unfair, deceptive, and unconscionable trade practices "constitutes remedial legislation"); *Kirby*, 2003-NMCA-074, ¶ 23 ("The Securities Act . . . has remedial purpose. . . . Its . . . provisions are aimed at protecting investors against unfair, deceptive, and fraudulent practices in the sale of securities.").

{32}    It is clear that the Legislature intended FATA to be a civil, remedial statute. However, even when "the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks and citation omitted, internal alteration omitted).

> [T]he court must determine whether the sanction established by the legislation was sufficiently punitive in its effect that, on balance, the punitive effects outweigh the remedial effect. Although a civil penalty may cause a degree of punishment for the defendant, such a subjective effect cannot override the legislation's primarily remedial purpose.

*White Chevy*, 2002-NMSC-014, ¶ 11 (internal citations omitted).

**D.    The Civil Remedies under FATA are Predominantly Compensatory**

{33}    The actual sanctions imposed under FATA include liability for the costs of a civil action and reasonable attorneys' fees for both the State and the qui tam plaintiff; a civil penalty of between five thousand and ten thousand dollars per violation; and

21

"three times the amount of damages sustained by the state." *See* § 44-9-3(C)(1). With regard to the retroactive effect of an award of the costs of bringing the qui tam action and attorneys' fees, we agree with the Court of Appeals that both "would fall under the rubric of compensating for government losses." *Foy*, 2013-NMCA-043, ¶ 28. We therefore turn to the retroactive effect of FATA's treble damages and civil penalties. We hold that treble damages under FATA are predominantly compensatory and may be applied retroactively. We hold that the nature of the civil penalties under FATA cannot be determined until after penalties are assessed.

**1.     Treble Damages**

{34}     Historically, New Mexico has followed the seven-factor test set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963), to determine whether a statute has a punitive effect. *See Druktenis*, 2004-NMCA-032, ¶ 30 ("[O]ur New Mexico Supreme Court referred to the *Mendoza-Martinez* framework as 'the test' in determining whether a statute is intended as punitive rather than remedial." (quoting *White Chevy*, 2002-NMSC-014, ¶ 11)); *see also State v. Block*, 2011-NMCA-101, ¶¶ 36-46, 150 N.M. 598, 263 P.3d 940 (analyzing civil penalty under Voter Action Act); *Kirby*, 2003-NMCA-074, ¶¶ 27-39 (analyzing civil penalty under Securities Act). These factors are:

1) whether the sanction involves an affirmative disability or restraint;

2) whether it has historically been regarded as a punishment;

3) whether it comes into play only on a finding of scienter;

4) whether its operation will promote the traditional aims of punishment—retribution and deterrence;

5) whether the behavior to which it applies is already a crime;

6) whether an alternative purpose to which it may rationally be connected is assignable to it; and

7) whether it appears excessive in relation to the alternative purpose assigned.

*Druktenis*, 2004-NMCA-032, ¶ 31. While these factors may "provide useful guideposts," *Hudson*, 522 U.S. at 99, they are "neither exhaustive nor dispositive," *Smith*, 538 U.S. at 97 (internal quotation marks and citation omitted).

{35} In regard to the nature of treble damages, recent United States Supreme Court opinions do not refer to the *Mendoza-Martinez* factors, but simply examine whether such damages are predominantly compensatory or predominantly punitive. *See*, *e.g.* *Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401, 405 (2003) (acknowledging that U.S. Supreme Court cases "have placed different statutory treble damages provisions on different points along the spectrum between purely compensatory and strictly punitive awards"); *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129-33 (2003) (acknowledging that treble damages under the FCA have compensatory and punitive traits, but concluding that, on balance, such damages are not essentially

23

punitive). In doing so, the Court has looked largely at the purpose of the legislation and the purpose of the treble damages. *See*, *e.g.*, *Agency Holding Corp. v. Malley-Duffy & Assocs., Inc.*, 483 U.S. 143, 151 (1987) (holding that RICO is "designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees."); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575-76 (1982) (holding that an antitrust private action "was created primarily as a remedy for the victims of antitrust violations . . . " and that "treble damages serve as a means of deterring antitrust violations and of compensating victims"); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977) (holding the treble damages under the Clayton Act "is designed primarily as a remedy").

{36} Given recent U.S. Supreme Court precedent, we believe this restorative approach is more appropriate in determining the retroactive effect of FATA. Therefore, if the primary purpose of treble damages under FATA is punitive, then they should be not be applied retroactively. *Cf. Ordunez*, 2012-NMSC-024, ¶ 14 ("The Ex Post Facto Clause flatly prohibits retroactive application of penal legislation." (internal quotation marks and citation omitted)). If the primary purpose of treble damages is remedial, then they should be upheld. *Cf. Foy*, 2013-NMCA-043, ¶ 11 ("The prohibition does not apply to penalties that are considered remedial

24

in nature.").

{37}     The U.S. Supreme Court has passed upon the nature of treble damages under the analogous federal FCA, *see* 31 U.S.C. § 3729(a)(1) (holding violators liable for civil penalties "plus 3 times the amount of damages which the Government sustains because of the act of that person"), on at least two occasions.  In *Vermont Agency of Natural Resources*, the Court held that a state was not a "person" for purposes of qui tam liability under the FCA.  *See* 529 U.S. at 787-88.  Although this case did not analyze the ex post facto implications of treble damages under the FCA, the Court was required to address whether treble damages are punitive in nature in determining whether states are subject to qui tam liability under the FCA.  *See id.* at 783, 84-85 ("Several features of the current statutory scheme . . . support the conclusion that States are not subject to *qui tam* liability [including treble damages].").  The Court concluded that "the FCA imposes damages that are essentially punitive in nature, which would be inconsistent with state *qui tam* liability in light of the presumption against imposition of punitive damages on governmental entities." *Id.* at 784-85.  The Court stated, "'[t]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.'" *See id.* at 786 (quoting *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639

25

(1981)). While these statements indicate that treble damages under FATA may be similarly punitive, the U.S. Supreme Court has since distinguished *Vermont Agency of Natural Resources*.

{38} In *Cook County*, a unanimous U.S. Supreme Court held that municipal corporations are "persons" for purposes of qui tam liability under the FCA. The municipal defendant argued that it was not subject to liability in part because the FCA imposes damages that are punitive in nature. *See* 538 U.S. at 129. The Court disagreed, distinguishing its earlier statements from *Vermont Agency of Natural Resources*.: "While the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation, the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive." *Cook County*, 538 U.S. at 130.

{39} We hold that the facts about FATA demonstrate that its treble damages feature possesses predominantly compensatory traits. Under FATA, one-third of the treble damages award is allocated to compensate the government for its loss. *See* § 44-9-7(E)(1) (requiring "proceeds in the amount of the false claim paid" to be returned to the fund from which it came). This portion of the damage award is, by definition, compensatory. *See Black's Law Dictionary* 394 (7th ed. 1999) (defining

26

"compensatory damages" as "[d]amages sufficient in amount to indemnify the injured person for the loss suffered.").

{40} Up to another thirty percent of the damage award is allocated to reward the qui tam plaintiff for exposing fraud and corruption in state government. *See* § 44-9-7(B) (entitling qui tam plaintiff to between 25 and 30 percent of the proceeds of the action or settlement if the State does not proceed with an action brought by a qui tam plaintiff and the State prevails in the action). The importance of this potential qui tam award under FATA should not be overlooked. Both this Court and the U.S. Supreme Court have held that a qui tam award as part of a treble damages scheme is remedial in nature. In *Denison v. Tocker*, 1951-NMSC-022, ¶¶ 11, 17, 55 N.M. 184, 229 P.2d 285, we held that the federal Housing and Rent Act, 50 U.S.C. Appendix, 1895 (1947, amended 1949) "is highly remedial, and the plain purpose of . . . authorizing recovery of three times the amount of an overcharge was to enlist the help of tenants by soliciting their aid in filing suits against overcharging landlords." In *Cook County*, the U.S. Supreme Court also stressed the importance of a qui tam award within the treble damages scheme of the FCA. According to the Court:

> The most obvious indication that the treble damages ceiling has a remedial place under this statute is its *qui tam* feature with its possibility of diverting as much as 30 percent of the Government's recovery to a

private relator who began the action. In *qui tam* cases the rough difference between double and triple damages may well serve not to punish, but to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefiting himself as well. The treble feature thus leaves the remaining double damages to provide elements of make-whole recovery beyond mere recoupment of the fraud.

538 U.S. at 131(citation omitted). Therefore, we hold that the qui tam provisions of FATA are compensatory.

{41} Having determined that actual damages and a potential qui tam award under FATA are compensatory, it follows that at least two-thirds of the treble damages under FATA are compensatory. *See Hess*, 317 U.S. at 551-52 (holding that "the chief purpose" of the earlier version of the FCA "was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole."). However, as *Cook County* suggests, the remaining approximately one-third of the treble damages under FATA also serve remedial purposes by encouraging more qui tam plaintiffs to root out fraud. We agree.

{42} Our conclusion is further bolstered by the allocation of the remaining damages under FATA. Under FATA, half of the remaining one-third of the damage award is allocated to fund the attorney general's anti-corruption efforts. *See* § 44-9-7(E)(3).

28

The other half is deposited in the state's general fund. *See id.* "There is no question that some liability beyond the amount of the fraud is usually necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims." *Cook County*, 538 U.S. at 130 (internal quotation marks and citations omitted). Furthermore, the government's injury includes "not merely the amount of the fraud itself, but also ancillary costs, such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices at the public purse." *Id.* at 130-131 (quoting *Halper*, 490 U.S. at 445 (internal quotation marks omitted)). Allocating a portion of the recovery to the attorney general helps to offset these costs. *See* NMSA 1978, § 44-9-7(E)(3)(a).

{43} Finally, when people or businesses commit fraud against the State, it deprives taxpayers of the use of funds for essential government services. The loss of use of money to fraudulent claims are the types of consequential damages not otherwise recoverable under FATA, which justify the conclusion that treble damages under FATA are predominantly compensatory. As noted by the U.S. Supreme Court in *Cook County*, "[t]he treble damages provision [under the FCA] was, in a way, adopted by Congress as a substitute for consequential damages." 538 U.S. at 131 n.9. In a similar fashion, allocating a portion of the treble damages award under FATA to

29

the general fund helps address consequential damages resulting from fraud. *See* NMSA 1978, § 44-9-7(E)(3)(b).

{44} In conclusion, we hold that treble damages under FATA are predominantly compensatory. As such, treble damages do not violate the ex post facto clause and may be awarded for conduct occurring prior to the effective date of FATA.

**2. Civil Penalties**

{45} A person who violates FATA is liable for "a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation." § 44-9-3(C)(2). Civil penalties are deposited in the current school fund. *See* § 44-9-7(E)(2). In terms of the retroactive effect of civil penalties, the Court of Appeals concluded that, "in the absence of compensatory purposes, [civil penalties] exhibit the qualities of deterrence and retribution intended to punish the offender." *Foy*, 2013-NMCA-043, ¶ 28. Because the civil penalties under FATA possess predominantly compensatory purposes, we disagree.

{46} As a general matter, "monetary assessments are traditionally a form of civil remedy." *See Kirby*, 2003-NMCA-074, ¶ 31 (internal quotation marks and citation omitted). "[N]either money penalties nor debarment has historically been viewed as punishment." *Hudson*, 522 U.S. at 104. However, the imposition of monetary

30

penalties has a deterrent purpose. *See State ex rel. Schwartz v. Kennedy*, 1995-NMSC-069, ¶ 38, 120 N.M. 619, 904 P.2d 1044 ("[M]onetary sanctions, such as fines or forfeitures, are qualitatively different from other types of administrative sanctions because of their distinctly punitive purposes."); *see also Hudson*, 522 U.S. at 105 ("Finally, we recognize that the imposition of both money penalties and debarment sanctions will deter others from emulating petitioners' conduct, a traditional goal of criminal punishment."). Nevertheless, "[a]lthough a civil penalty may cause a degree of punishment for the defendant, such a subjective effect cannot override the legislation's primarily remedial purpose." *White Chevy*, 2002-NMSC-014, ¶ 11. In addition, "[deterrence] may be a valid objective of a regulatory statute," *Id.* ¶ 14 (internal quotation marks and citation omitted), and "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals." *Hudson*, 522 U.S. at 105 (internal quotation marks and citation omitted); *see also Schwartz*, 1995-NMSC-069, ¶ 37 ("[T]he fact that the regulatory scheme has some incidental deterrent effect does not render the sanction punishment . . . ."). Therefore, a monetary sanction has a "deterrent or retributive purpose if it is not designed to compensate the government for its losses." *Id.* ¶ 38.

{47}     The U.S. Supreme Court has found that civil penalties under an earlier version

31

of the federal FCA are compensatory. In *Hess*, the U.S. Supreme Court held that

> "the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific [penalty] sum [$2,000 per claim] was chosen to make sure that the government would be made completely whole."

317 U.S. at 551-52. In *Vermont Agency of Natural Resources*, however, the U.S. Supreme Court stated that the earlier version of the Fraud Claims Act which imposed a civil penalty of only $2,000 per claim was remedial rather than punitive, while the current version authorizing civil penalties of up to $10,000 per claim is punitive. 529 U.S. at 784-85. The Supreme Court was not clear, however, where on the given spectrum ($2,000 to $10,000) the penalty moves from remedial in effect to punitive.

{48}     The New Mexico appellate courts have found civil penalties in the amount of $5,000 to be predominantly restorative. In *Kirby*, the New Mexico Securities Division assessed $75,000 in fines against the defendant for violations of the former New Mexico Securities Act. *See* 2003-NMCA-074, ¶ 5. The former Act authorized that the director of the Securities Division to "issue an order against an applicant, licensed person or other person who violates the act, imposing a civil penalty up to a maximum of five thousand dollars ($5,000) for each violation." § 58–13B–37(B)(4) (1993). The Court of Appeals "conclude[d] that the civil penalty

32

imposed upon Defendant in this matter was not sufficiently punitive in its effect that, on balance, the punitive effect outweighed its remedial effect." *Kirby*, 2003-NMCA-074, ¶ 39.

{49}   Turning specifically to FATA, the imposed penalty ranges from $5,000 to $10,000 per violation, leaving the exact award to the discretion of the trial judge. § 44-9-3(C)(2). It is, therefore, conceivable that the amount awarded in civil penalties could be punitive in effect, particularly if the trial judge awards the maximum $10,000 per violation. *See Vt. Agency of Natural Res.*, 529 U.S. at 785; *see also Hudson*, 522 U.S. at 103 ("The Eighth Amendment protects against excessive civil fines, including forfeitures."). It is equally conceivable that a lesser award would not be considered punitive. It is not practical to make that determination without knowing the actual amount assessed with full briefing on appeal addressed to a specific dollar figure. *See Boese*, *supra*, § 3.06(D) ("While a constitutional challenge to disproportionate damages and penalties is a legitimate issue to be raised in many FCA cases, the issue normally cannot be determined until after the trial verdict regarding actual damages."). We therefore decline to resolve the issue of whether the civil penalties awarded under FATA are punitive and violate ex post facto principles until there is a definitive amount awarded.

33

**CONCLUSION**

{50}     We hold that FATA is constitutional.  The judgment of the district court is affirmed in part and reversed in part.  We remand the consolidated matter to the district court for further proceedings consistent with this Opinion.

{51}     **IT IS SO ORDERED.**


_____
                    **PETRA JIMENEZ MAES, Justice**


**WE CONCUR:**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**


_____
**M. MONICA ZAMORA, Judge**
**Sitting by designation**

34